# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

RICHARD GUY,

    Plaintiff,

v.                                                               CV 12-0774 JCH/WPL

CORIZON, INC.,

    Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

Richard Guy, a prisoner who has been incarcerated at several New Mexico Department of Corrections facilities over the last few years, filed a complaint against Corizon, Inc., the medical provider at these facilities, pursuant to 42 U.S.C. § 1983. (Doc. 8 at 2-3.) Guy alleges that Corizon violated his Eighth Amendment rights by impermissibly delaying the treatment of his skin conditions. (*Id.*) Corizon has filed a *Martinez* report in which it asks the Court to dismiss Guy's claim based on, *inter alia*, his failure to exhaust administrative remedies. (Doc. 23 at 31-34.) This matter has been referred to me to make findings of fact, conduct legal analysis, and recommend a final disposition. (Doc. 11.) Having considered the relevant law, along with the *Martinez* report and its supplement (Doc. 30), Guy's response (Doc. 26), and Corizon's reply (Doc. 31), I find that Guy failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a) (2006). I therefore recommend that the Court dismiss Guy's claim without prejudice.

**FACTUAL BACKGROUND**

At all relevant times, Guy has been incarcerated at one of four New Mexico correctional facilities: Lea County Correctional Facility ("LCCF"), Southern New Mexico Correctional Facility ("SNMCF"), Western New Mexico Correctional Facility ("WNMCF"), and Central New Mexico Correctional Facility ("CNMCF"). His claims center on the medical care received at these facilities since 2009. Unless otherwise indicated, the facts described herein are not in dispute.

By all accounts, Guy first sought medical care at LCCF for skin problems on his face and nose from a Dr. Andrade on October 20, 2009. (Doc. 23 at 10; Doc. 26 at 1.) The medical notes from that visit show that Guy presented with a face and nasal rash. (Ex. A at 300.)[1] Although Guy now says that Dr. Andrade "had no idea[] what kind of skin problem I had" (Doc. 26 at 1), medical notes show that Dr. Andrade diagnosed cellulitis on the nose and suspected a methicillin-resistant Staphylococcus aureus ("MRSA") infection (Ex. A at 300). Records indicate that Dr. Andrade prescribed two antibiotics, clindamycin and Bactrim (*see id.* at 300, 357); Guy states that he received an antibiotic shot and was sent back to his cell (Doc. 26 at 1.)

Guy underwent at least seven additional examinations for skin conditions by the medical team at LCCF between March 2010 and January 2011. (Ex. A at 301 (March 4, 2010), 296 (April 15, 2010), 302 (April 22, 2010), 363 (October 18, 2010), 305 (November 4, 2010), 500 (November 10, 2010), 365 (January 18, 2011).) In addition to the earlier suspicions of MRSA, Guy was diagnosed with several skin conditions during this period, including dermatitis (*id.* at 301), angiofibromas (*id.* at 337-38), and possible eczema (*see id.* at 459). His examining doctors also performed several laboratory analyses, including biopsies of the skin on Guy's nose and

---

[1] Unless otherwise indicated, all exhibit labels refer to exhibits to Corizon's *Martinez* report, which is docket number 23.

other procedures. (Doc. 26 at 2; Ex. A at 302, 365) Throughout this period, Guy was prescribed a number of corticosteroids and antibiotics, including but not limited to Bactrim, clindamycin, hydrocortisone cream, triamcinolone cream, and acyclovir, as well as some medicated shampoo.[2] (Ex. A at 301, 305, 365, 414, 417, 422, 450, 459, 461, 623.) He was also advised to stop scratching, popping, and picking at any lesions. (*Id.* at 363, 459; *see also id.* at 500 (noting that Guy felt "a compulsion to pick at the sores").)

On January 11, 2011, Guy submitted an Inmate Grievance form complaining about various aspects of his medical care. (Ex. D Att. 8.) As part of this grievance, Guy complained that he had asked for an antibiotic ointment several times but was given pills instead, that he continually suffered from "infections such as staph and tubercul[osis]," and that LCCF's medical department had lied in its responses to his previous grievances. (*Id.*) The grievance officer returned the form to Guy on January 13 because Guy had failed to first submit an informal grievance with respect to his concerns (*id.* at 1), and there is no evidence that further grievance forms were filed at LCCF regarding these issues or any other skin conditions. Notably, on January 12, Guy was given triamcinolone cream for external treatment of his skin conditions, along with several anti-fungal medications. (*See* Ex. A at 450.)

Guy was transferred to SNMCF on February 8, 2011. (*Id.* at 756.) At his initial baseline examination on March 2, 2011 (*see id.* at 735), the clinician made note of a postule on Guy's nose and called for a Bactrim prescription on his plan for medication changes (*id.* at 737-38; *see*

---

[2] Corizon points out that Guy was also prescribed Vistaril, implying that this medication was being used to treat Guy's skin conditions. (Doc. 23 at 13 (citing Ex. A at 365).) Vistaril is the brand name for hydroxyzine, a drug that is sometimes prescribed to treat allergic skin reactions. PHYSICIANS' DESK REFERENCE 2659-60 (57th ed. 2003). However, Vistaril is also used to treat anxiety and tension, *id.*, and in Guy's case the medication was prescribed in conjunction with Zoloft, the brand name for sertraline, a selective serotonin reuptake inhibitor that is generally prescribed for depression, *id.* at 2675-76. Guy's medical records indicate that he was prescribed hydroxyzine and sertraline as psychiatric medications, not as treatments for any skin condition. (*See, e.g.*, Ex. A at 493.)

*also id.* at 624). Nine days later, it was noted that Guy's skin rash had "almost completely resolved with the antibiotic" but that Guy still had several lesions. (*Id.* at 578.) Guy was diagnosed with a "[r]esolving staph infection" and lesions (*id.*), he was again prescribed Bactrim (*id.* at 624), and his acyclovir prescription was continued (*id.* at 669). On March 18, 2011, Guy reported that most of the lesions on his face and back were gone, though one lesion remained on his lip. (*Id.* at 579-80.) He continued to apply ointment, and he underwent at least three more medical visits over the next two weeks, during which time his lip apparently improved. (*Id.* at 581-83.) His Bactrim prescription was continued on March 31, 2011. (*Id.* at 625.)

Guy was seen at least nine more times by SNMCF medical personnel for his skin ailments over the next year. (*Id.* at 584 (April 18, 2011), 585 (April 26, 2011), 586 (May 12, 2011), 588 (May 18, 2011), 744-46 (June 8, 2011), 592 (July 13, 2011), 747-48 (September 16, 2011), 596 (October 3, 2011), 505-07 (March 7, 2012).) During that period, clinicians and doctors diagnosed or attempted to rule out diagnoses of MRSA or a recurrent staph infection (*id.* at 584, 592, 596, 745), cutaneous abscess formations (*id.* at 584), late-stage rosacea (*id.* at 585), allergic dermatitis (*id.* at 586, 588), and infectious pustules (*id.* at 588). A laboratory analysis was completed at least once on secretions from Guy's lesions (*see id.* at 584), and clinicians instructed Guy on proper hygiene to avoid repeated infection (*e.g. id.* at 592). They also prescribed Bactrim, Benadryl,[3] triamcinolone cream, clindamycin, several corticosteroids, prescription shampoo, and other medications for his skin conditions at various times during this period. (*Id.* at 592, 626-29, 631, 634, 636, 676-86.) At several points during this treatment, Guy's skin conditions appeared to be resolving or resolved. (*See id.* at 585 (noting healed lesions in April 2011), 588 (observing continued rashes but "good result" from treatment of infectious

---

[3] The Benadryl prescription was quickly discontinued, apparently due to conflicts with another prescription. (Ex. A at 628.)

4

pustules), 751-52 (making no note of skin conditions shortly before Guy's transfer from SNMCF).) Guy did not file any medical grievances related to his skin conditions during his time at SNMCF. (Ex. F at 1.)

Guy was transferred to WNMCF on April 6, 2012, (Ex. A at 203), with most of his prescriptions from SNMCF apparently transferring with him (*id.* at 168). Guy was only incarcerated at WNMCF for approximately six months, during which time he was seen at least five times by medical personnel for issues relating to his skin conditions. (*See id.* at 164 (May 24, 2012), 197-98 (June 13, 2012), 165 (July 24, 2012), 145 (July 30, 2012), 146 (September 24, 2012).) Although medical records for these encounters are less complete, it is clear that Guy was again diagnosed with MRSA no later than July 2012. (*See id.* at 159.) At various points throughout this period, Guy was prescribed Bactrim and clindamycin (*id.* at 145, 164-65, 175, 183, 192); the Bactrim prescription in particular was increased multiple times once it became apparent that a longer period of treatment might be needed to clear the MRSA infection (*see id.* at 145, 183, 192).

On September 3, 2012, Guy filed an informal complaint, asserting that he had been suffering from a staph infection for the past two years without interruption and that he had only been prescribed pills to stop it. (Ex. 2 Att. E.) The reviewing staff member noted that he received the complaint on September 13, and on September 18 he replied that Guy had been examined several times since transferring to WNMCF and that he had been prescribed medication to treat MRSA at least twice. (*Id.*) He also stated that Guy was scheduled for a chronic disease clinic appointment soon. (*Id.*) There is no indication on the complaint form that Guy appealed this outcome, though Guy underwent one final relevant examination later that month and was prescribed additional Bactrim afterwards. (Ex. A at 146.)

Guy was again transferred, this time to CNMCF, on October 2, 2012. (*Id.* at 82.) There is no mention of any skin problems in any medical records from the facility after that date, and Guy has not filed any medical grievances related to any skin conditions at CNMCF (Ex. B at 1). At a chronic disease clinic follow-up assessment in January 2013, the clinician noted that Guy was free of nodes and rashes. (Ex. A at 811.) Guy says that he has recently seen a Dr. Barry Beaven at CNMCF and complained of having the same sores that he experienced with his staph infection; Dr. Beaven has allegedly claimed that these sores are simply acne and has refused to order a round of clindamycin topical solution. (Doc. 26 at 5-6.)

## PROCEDURAL BACKGROUND

Guy filed his first complaint in this action against several Defendants on July 10, 2012, while he was still incarcerated at WNMCF, alleging various wrongful activity at the facilities where he had been incarcerated. (Doc. 1.) Guy filed two additional complaints over the remainder of July 2012 (*see* Doc. 3, Doc. 5), with his first claims against Corizon appearing in his July 27, 2012 filing (Doc. 5 at 7). In the latter document, Guy brought allegations that mostly related to sanitation and overcrowding matters that are no longer the subject of this action. (*See* Doc. 10.) However, in a fourth complaint filed on September 11, 2012, Guy alleged that Corizon had been deliberately indifferent to his serious medical needs by misdiagnosing his skin conditions as herpes and by delaying sufficient treatment of his staph infection. (Doc. 8 at 2-3.)

On December 18, 2012, the Court considered these filings *sua sponte* under 28 U.S.C. § 1915(e) and Federal Rule of Civil Procedure 12(b)(6). (Doc. 10 at 1-2.) Construing all of Guy's filings to date as a single complaint pursuant to § 1983, the Court dismissed all Defendants from this action except for Corizon and all claims except for that of deliberate indifference, specifically for delay in medical treatment. (*Id.* at 3-6.)

After Corizon answered Guy's complaint (Doc. 18)[4], I ordered it to submit a *Martinez* report responding to Guy's claim and providing all relevant information (Doc. 19). In the Order, I told the parties that the information presented in the *Martinez* report and any responses thereto could be used in determining whether to award summary judgment to either party. (*Id.*) Corizon thereafter filed its *Martinez* report, which asserted that Guy failed to exhaust his administrative remedies and that his complaint failed to state a cognizable Eighth Amendment claim for deliberate indifference under § 1983. (Doc. 23.) Guy filed a response that largely asserts many of the same factual claims appearing in his earlier pleadings, though he also briefly contends that he has filed "numerous informal complaints" and has never received a reply. (Doc. 26.) Corizon thereafter filed a reply (Doc. 31) and, at my instruction, supplemented its briefing with copies of the policies and procedures governing the grievance process at the prisons in question (Doc. 30).

## STANDARD OF REVIEW

Summary judgment is appropriate where the pleadings, discovery materials, and affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit, and the dispute is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted). In determining whether a plaintiff meets this two-part test, this Court must "construe the facts in the light most favorable to the plaintiff as the nonmoving party." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009) (citing

---

[4] Subsequent to the filing of Corizon's answer, but before Corizon filed its *Martinez* report, Guy filed a purported response to the answer in which he attempted to bring new claims against several other Defendants. (Doc. 20.) At my recommendation (Doc. 21), the Court construed Guy's filing as an amended complaint and dismissed the claims against the new Defendants pursuant to 28 U.S.C. § 1915(e)(2) and Rule 12(b)(6) (Doc. 24).

*Scott v. Harris*, 550 U.S. 372, 378 (2007)). In ruling on a summary judgment motion, the Court may neither make credibility determinations nor weigh the evidence. *Gossett v. Oklahoma*, 245 F.3d 1172, 1175 (10th Cir. 2001) (quotation marks omitted).

For purposes of summary judgment, a prisoner's complaint is treated as an affidavit if it alleges facts based on his personal knowledge and has been sworn under penalty of perjury. *Hall*, 935 F.2d at 1111 (citation omitted). A *Martinez* report is also treated as an affidavit, and this report and the supporting documents can be used in determining whether to grant summary judgment if the report's statements are based on personal knowledge and sworn under penalty of perjury. *Id.* A court cannot resolve material disputed factual issues by accepting a *Martinez* report's findings when they are in conflict with pleadings or affidavits. *Id.* at 1109. However, conclusory allegations without specific supporting facts have no probative value and cannot create a genuine issue of fact. *See Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005); *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004); *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992). As is true with all affidavits, statements of mere belief must be disregarded. *Argo v. Blue Cross & Blue Shield*, 452 F.3d 1193, 1200 (10th Cir. 2006).

Finally, as with all pleadings filed by pro se individuals, I liberally construe the allegations contained in Guy's complaint and his response to the *Martinez* report. *Northington v. Jackson*, 973 F.2d 1518, 1520-21 (10th Cir. 1992) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)). However, the Court must apply the same legal standards applicable to pleadings drafted by counsel. *Id.*

## DISCUSSION

Corizon raises Guy's failure to exhaust administrative remedies as an affirmative defense. (Doc. 23 at 31-34.) The PLRA prohibits any prisoner from bringing an action regarding prison

conditions until he has exhausted all available administrative remedies. 42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516, 524 (2002) (recognizing that exhaustion is required for any suit challenging prison conditions, regardless of the cause of action). Because Congress has specifically mandated exhaustion of administrative remedies, the Court cannot waive this requirement, even if the remedy sought is not actually available to the prisoner through the administrative process. *Booth v. Churner,* 532 U.S. 731, 739 (2001) (citing *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992)).

A prisoner must properly complete the full administrative review process set by the facility's grievance policy in order to exhaust administrative remedies. *See Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010) ("[A]n inmate may only exhaust by properly following all of the steps laid out in the prison system's grievance procedure." (citing *Woodford*, 548 U.S. at 90)). A prisoner's failure to exhaust administrative remedies is an affirmative defense, *see Jones*, 549 U.S. at 216, that the defendant bears the burden of establishing, *see Roberts v. Barreras*, 484 F.3d 1236, 1240-41 (10th Cir. 2007) (citations omitted).

The administrative grievance process in place for medical complaints at each of the relevant facilities was governed at all times by New Mexico Corrections Department Policy and Procedure No. CD-150500 on "Inmate Grievances." (*See* Doc. 30 Ex. G at 2 (affidavit of Mark Delgado); *see also, e.g.*, Doc. 30 Ex. G Att. 1 at 5 (noting that the application of medical care policy and matters "relating to conditions of care or supervision within the authority of the New Mexico Corrections Department or its contractors" fall within the grievance process in question).) According to the policy, a prisoner with a complaint must first submit an Inmate Informal Complaint, Form CD-150501.3, to the unit manager, the chief of security, or a

designee. (*E.g.* Doc. 30 Ex. G Att. 1 at 9.)[5] If the prisoner believes that his grievance has not been resolved, he may then file an Inmate Grievance, Form CD-150501.1, to the facility's grievance officer, along with the attached unresolved Inmate Informal Complaint. (*E.g. id.*) The grievance officer then recommends a disposition of the grievance, and the warden may then approve, disapprove, or alter the recommendation before returning the Inmate Grievance to the prisoner with his response. (*E.g. id.* at 11-12.) If the prisoner is not satisfied with the warden's response, he may appeal the decision to the Secretary of the Department of Corrections. (*E.g. id.* at 12.) Any decision by the Secretary or his designee is considered the final decision on the grievance. (*E.g. id.* at 13.)

Of the eight grievance documents that Guy submitted while incarcerated at LCCF, only one related in any way to allegations regarding the treatment of his skin conditions. (*See* Ex. D Att. 8 (alleging, among other things, that Guy was once given antibiotics in pill form rather than ointment form and that he once spent three days in medical segregation without seeing any medical personnel).) That Inmate Grievance, dated January 11, 2011, was denied because Guy did not first file an Inmate Informal Complaint pursuant to the grievance policy. (*Id.* at 1.) Guy did not appeal this decision, and there is no evidence that Guy later filed an informal complaint on the matter while at LCCF. (*See* Ex. D at 3-4 (affidavit of Don Douglas).) As such, the evidence establishes that Guy did not fully exhaust his administrative remedies while incarcerated at LCCF, as he did not complete the full grievance process with respect to his complaints of delayed medical treatment. *See Little*, 607 F.3d at 1249 (citation omitted).

---

[5] Policy and Procedure No. 150500 was revised at least twice during the relevant time period. (*See* Doc. 30 Ex. G Atts. 1-3.) However, the provisions relevant to my analysis were substantially unchanged over that time period. Accordingly, I only cite to the oldest version of the policy submitted to me, which was revised in April 2009 and remained in place until February 2011. (*See* Doc. 30 Ex. G Att. 1 at 1, Doc. 30 Ex. G Att. 2 at 1.)

There is no evidence that Guy filed any grievance materials with respect to his medical treatment while incarcerated at SNMCF, and the health services administrator at that facility affirmatively asserts that Guy did not file any such grievances. (*See* Ex. F (affidavit of Sheri Pierce).) Accordingly, the evidence establishes that Guy did not exhaust administrative remedies with respect to medical care for his skin conditions, or even avail himself of such remedies, during his time at SNMCF. *See Jones*, 549 U.S. at 218 (citation omitted).

On September 3, 2012, while incarcerated at WNMCF, Guy submitted an Inmate Informal Complaint stating that he had been suffering from a staph infection for two years with insufficient treatment. (Ex. E Att. 2.) The reviewing staff member responded that Guy had been seen multiple times by medical staff and referred to his diagnosis, his prescriptions, and his upcoming chronic disease clinic appointment. (*Id.*) Guy did not appeal this decision. (*Id.*; *see also* Ex. E at 7 (affidavit of Peter Laraia).) Therefore, the evidence shows that Guy did not fully exhaust his administrative remedies with respect to his delayed treatment claim while housed at WNMCF. *See Little*, 607 F.3d at 1249 (citation omitted).

Finally, neither Guy nor Corizon has submitted any evidence that Guy filed any medical grievances after being transferred to CNMCF, and the health services administrator at that facility affirmatively states that Guy has filed no such grievances. (*See* Ex. B at 1 (affidavit of Mark Delgado).) As such, his administrative remedies with respect to any complaints of delayed medical treatment at that facility were not exhausted. *See Jones*, 549 U.S. at 218 (citation omitted).

Guy does not assert that the two grievances mentioned above were fully exhausted. Rather, he alleges that the administration at these prisons failed to either log or respond to many informal complaints during the relevant period. (Doc. 26 at 10.) However, such conclusory

statements cannot create a genuine issue of material fact without supporting evidence, *see Fitzgerald*, 403 F.3d at 1143, and Guy has submitted no evidence of additional medical grievances, either formal or informal. Accordingly, I cannot assign any probative weight to his assertions regarding his medical grievances.

Based on the evidence before me, I conclude that Guy failed to exhaust his administrative remedies with respect to his allegations of delayed medical treatment. The PLRA therefore requires dismissal of this action until such remedies are exhausted. *See* 42 U.S.C. § 1997e(a). Accordingly, I recommend that Guy's Eighth Amendment claim against Corizon be dismissed. Further, since dismissals for failure to exhaust are typically without prejudice, *see Patel v. Fleming*, 415 F.3d 1105, 1109 (10th Cir. 2005), I recommend that the Court dismiss Guy's claim without prejudice.

## RECOMMENDATION

Corizon has established that Guy has not fully exhausted his administrative remedies pertaining to his allegations of delayed medical treatment as required under the PLRA. Therefore, I recommend that the Court dismiss Guy's Eighth Amendment claim against Corizon without prejudice.

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.